UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DEANDRE WILSON

                Petitioner,

                                                        CASE NO. 06-13233
v.                                                      HONORABLE GERALD E. ROSEN

JAN TROMBLEY,

                Respondent.
_____/

**OPINION AND ORDER
DENYING PETITIONER'S HABEAS CORPUS PETITION,
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY,
BUT GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Pending before the Court is petitioner Deandre Wilson's habeas corpus petition under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions for first-degree murder, assault with intent to commit murder, and related firearm offenses. Petitioner alleges that (1) the trial court abused its discretion by admitting extensive evidence of a prior murder that Petitioner supposedly committed and (2) defense counsel was ineffective for failing to challenge identification testimony that was based on a suggestive photographic line-up. Respondent Jan Trombley urges the Court to deny the habeas petition on grounds that Petitioner's claims lack merit or are not cognizable on habeas review. The Court agrees that Petitioner's claims do not warrant granting the writ of habeas corpus. Accordingly, the habeas petition will be denied.

**I. Background**

Petitioner's convictions arose from a nighttime shooting at a house on Acacia Street in

Detroit, Michigan on September 17, 2000. A sixteen-year-old girl, Tiara Powell, was shot and killed while lying in her bed. Three adults in the house also were shot, but they survived and testified against Petitioner at trial. The prosecutor's theory was that Petitioner went to the house on Acacia Street to kill Terry Moore, who lived in the basement of the house. Moore was not harmed during the incident, and he was unable to identify Petitioner as one of the shooters. He did implicate and identify Petitioner as someone who shot Moore's friend, Edward Burton, about two months earlier on July 5, 2000.

The facts surrounding the September 17 incident have been summarized by the state court as follows:

> In early September 2000, defendant approached Ruby Griswold, who lived with Cornelius Terry Moore at a house on Acacia Street, and asked her if Moore lived there. When Griswold asked defendant to identify himself, defendant responded, "[J]ust tell him I'll be back."
>
> At about midnight on September 17, 2000, Griswold and Moore were in their bed in the basement of the Acacia Street house, when Griswold heard knocking on the front door of the home. When she went to the door, she saw a young woman, who told her that she was "Fred's daughter" and that she required Moore's assistance in helping her board up her property after a break-in. Griswold attempted to awaken Moore, but when he was unresponsive, she retrieved a hammer and nails and told the woman that she would help. After Griswold stepped out of the house onto the porch, defendant approached her, put a gun to her head, and told her to open the door. Griswold opened the door and defendant pushed her inside toward the back of the house. Defendant was angry and kept asking Griswold, "[W]here is he at?" The unidentified woman, who was now holding a gun, then pushed Griswold into the bathroom. Defendant proceeded to one of the bedrooms and knocked on the door. Griswold began struggling with the woman and the woman's gun discharged. The bullet hit Griswold in the back of her ear and exited her cheek. Griswold continued to struggle with the woman when defendant entered the bathroom and struck her, knocking her into the bathtub. Defendant then shot Griswold in the arm as she raised it to defend herself. Griswold managed to escape by climbing out of the bathroom window.
>
> Meanwhile, Wanna Powell, the owner of the Acacia Street house, and her

> boyfriend, Jerry Boyd, became concerned when they heard knocking on their bedroom door and then gunshots. Boyd grabbed a club and Powell opened the door. Powell was immediately confronted by defendant and the unidentified woman, who both began shooting. Defendant shot Powell in the leg and the woman entered the bedroom and attacked Powell, hitting her in the head with a hammer. Boyd grabbed defendant and the two began to "tussle." During the struggle, defendant shot Boyd four times. Powell and Boyd kept asking defendant and the woman who they were looking for. Defendant yelled, "[W]here's the * * * *er at?" Powell was able to wrestle the hammer away from the woman, but the woman grabbed Powell's neck and began strangling her. The woman then abruptly got up and left with defendant.
>
> After defendant and the woman left, Powell walked across the hall to the bedroom of her daughter, Tiara Powell, who was also Moore's daughter. Powell discovered Tiara in her bed with a bullet wound in her face. Tiara was still breathing at that point, but died a short time later. When Moore emerged from the basement, defendant and the woman were gone.

*People v. Wilson*, No. 247211, 2004 WL 1837672, at *1-2 (Mich. Ct. App. Aug. 17, 2004) (unpublished).

On January 23, 2003, a circuit court jury in Wayne County, Michigan found Petitioner guilty, as charged, of one count of first-degree (premeditated) murder, three counts of assault with intent to commit murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony (felony firearm). The trial court sentenced Petitioner as a habitual offender (fourth offense) to five years in prison for the felony firearm conviction, followed by concurrent terms of life imprisonment for the murder and the three assaults and six to ten years for being a felon in possession of a firearm. Petitioner appealed his convictions as of right, raising his two habeas corpus claims. The Michigan Court of Appeals affirmed his convictions, *see id.*, and on April 26, 2005, the Michigan Supreme Court denied leave to appeal. *See People v. Wilson*, 472 Mich. 894; 695 N.W.2d 76 (2005) (table). Petitioner filed his habeas corpus petition on July 18, 2006.

## I. Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's majority opinion on Part II). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

## III. Discussion

### A. Evidence of Another Crime

Petitioner alleges that the trial court abused its discretion by admitting extensive evidence that he committed another murder a few months before the September 17 murder in this case. As explained by the state court,

> [t]he disputed evidence showed that on July 5, 2000, [Edward] Burton drove [Terry] Moore to the home of Fred Jones and defendant's mother, Gail Wilson. When they arrived, Burton stopped the car and sounded the car horn to summon Jones. Defendant emerged from behind the house, appearing agitated and yelling profanities at Burton for blowing the horn in front of his mother's house. Defendant walked up to the driver's side of the car and punched Burton in the face. Burton pulled into the driveway of the home, striking Gail's parked car. Defendant picked up a cinderblock and threw it at Burton's front windshield, breaking the glass. When Moore grabbed defendant, defendant told Gail to "get the gun." Gail ran into the house and came back out holding a gun. Burton drove away, but after a few blocks, he noticed a small red car following them. Burton unsuccessfully tried to evade the red car, and eventually pulled into an alley. Egress from the alley was blocked by a parked van. Defendant stopped his car, got out, and ran into the alley. Moore fled the car on foot when he saw defendant entering the alley with a gun. Moore then heard gunshots. A witness saw defendant jog out of the alley, throw a gun into the backseat of the car, and drive away. When Moore returned to the alley a short time later, he found Burton in the driver's seat of his car with a fatal gunshot wound in his head.

*Wilson*, 2004 WL 1837672, at *2.

Petitioner claims that this evidence confused the real issue (whether he was guilty of the charged offenses) and resulted in the presentation of cumulative evidence. He maintains that the evidence may have had a proper purpose, but that it was excessive and it tended to create the impression that he was a bad person, a prohibited inference under the rules of evidence.

The trial court held a hearing on this issue and determined that (1) there was a proper purpose for evidence about the prior murder, (2) the evidence was relevant, and (3) the probative value of the evidence was not substantially outweighed by unfair prejudice. The Michigan Court of Appeals agreed and concluded that the trial court did not abuse its discretion by admitting the evidence.

### 1. *Bugh v. Mitchell*

Habeas corpus review ordinarily does not extend to state court rulings on the admissibility of evidence. *Fuson v. Jago,* 773 F.2d 55, 59 (6th Cir. 1985). Furthermore,

> [t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence . . . . While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003); *see also Bey v. Bagley*, 500 F.3d 514, 519-23 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1704 (2008). Because there is no Supreme Court decision holding that the admission of "other acts" evidence violates the Constitution, the state court's conclusion that the evidence was admissible cannot be deemed "contrary to" Supreme Court precedent under 28 U.S.C. § 2254(d).

### 2. Fundamental Fairness

Even if *Bugh v. Mitchell* were not dispositive of the issue, state court evidentiary errors warrant habeas corpus relief only if the error rendered the proceeding "so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004). In Michigan, evidence of other crimes is admissible for the purpose of proving motive and identity. Mich. R. Evid. 404(b)(1). "[E]vidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by . . . needless presentation of cumulative evidence." Mich. R. Evid. 403.

The admission of evidence about the July 5 murder was not fundamentally unfair for the following reasons. First, although a prosecutor may not dwell on a defendant's bad character to

prove that the defendant committed the crime charged, *Cristini v. McKee*, __ F.3d __, __, No. 06-1606, 2008 WL 2129742, at *10 (6th Cir. May 22, 2008), there was a proper purpose for admitting evidence about the July 5 murder. The evidence provided a context and motive for the September 17 murder. The prosecutor's theory was that Petitioner went to the Acacia Street house intending to kill Terry Moore, who was the only person who could identify Petitioner as Edward Burton's murderer in the prior case.

Second, one of the main issues at trial was the identity of the male shooter. Petitioner's defense was that he was in Indianapolis, Indiana with his girlfriend when the September 17 murder occurred, and his attorney maintained that the primary issue was identification. "When identity is in question, motive is key." *House v. Bell*, 547 U.S. 518, 540 (2006).

Third, testimony about the July 5 murder was not the only evidence connecting Petitioner to the September 17 murder. Three eyewitnesses testified that Petitioner was one of the two shooters at the Acacia Street house on September 17.

Finally, defense counsel pointed out to the jury that Petitioner was not on trial for the July 5 incident. In addition, both the prosecutor and the trial judge cautioned the jury not to conclude from evidence about the July 5 incident that Petitioner was a bad person or that he must be guilty of the September 17 offenses. Petitioner admits that the trial court properly instructed the jury on the use of "other acts" evidence.

To summarize, the disputed evidence was admitted for a proper purpose: to show identity and motive. The evidence was not the only basis for linking Petitioner to the crimes committed on September 17, and the jury was informed of the proper use of the evidence. Therefore, evidence that Petitioner murdered Edward Burton on July 5, 2000, was not so

fundamentally unfair as to deprive Petitioner of due process, and the state court's resolution of his claim was not contrary to, or an unreasonable application of, any Supreme Court decision. Petitioner is not entitled to relief on the basis of his first claim.

### B. Trial Counsel

Petitioner alleges that his trial attorney's failure to challenge a suggestive photo array amounted to ineffective assistance of counsel. Petitioner contends that his complexion was significantly darker than that of the other five men in the photo array. He argues that, if his attorney had been successful in suppressing testimony about the photographic line-up, there is a reasonable probability that the outcome of the trial would have been different because there was no physical evidence linking him to the crimes.

The Michigan Court of Appeals determined that a motion to suppress the lineup identification would have been futile because there was no indication that the photo array was impermissibly suggestive. The court of appeals concluded that Petitioner had failed to overcome the presumption that his attorney's decision not to challenge the admissibility of the identification testimony was sound trial strategy.

#### 1. *Strickland v. Washington*

The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984), qualifies as "clearly established federal law" under 28 U.S.C. § 2254(d)(1). *Williams v. Taylor*, 529 U.S. at 391. The Supreme Court stated in *Strickland* that an attorney is ineffective if the attorney's "performance was deficient" and "the deficient performance prejudiced the defense." *Id.* at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

### 2. Suggestive Pretrial Identifications

In order to assess Petitioner's ineffectiveness claim, the Court must consider the underlying claim that the pretrial identification procedure was impermissibly suggestive. The Supreme Court has stated that improper use of photographs by the police can cause witnesses to err in identifying criminals. *Simmons v. United States*, 390 U.S. 377, 383(1968). This danger is increased if the police show the witness a photograph that somehow emphasizes an individual. *Id*. However, "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*. at 384.

If the pretrial identification was unnecessarily suggestive, courts must consider whether the identification nonetheless was reliable. *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005), *cert. denied*, 546 U.S. 1100 (2006). Factors to be considered in making this assessment are: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the

9

witness's level of certainty at the time of the identification; and (5) the length of time between the crime and the identification. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

### 3. Application

Although Investigator Tawnya King testified that Ruby Griswold did not participate in a photographic show-up, Griswold testified that she identified Petitioner in a photo array. Griswold did not mention the shooter's complexion, however, when she described the suspect to the police. Therefore, Petitioner's complexion is not a basis for finding the photo array unduly suggestive as to Griswold. *Howard v. Bouchard*, 405 F.3d at 471 (citing *United States v. Gibson*, 135 F.3d 257, 260 (2d Cir. 1998)).

Jerry Boyd identified Petitioner to the police as dark skinned, and within seconds of viewing a photo array, Boyd selected Petitioner's photograph from an array of six photographs. He informed a police officer that the photograph of Petitioner looked just like the suspect. Boyd admitted at trial that Petitioner's skin was significantly darker than the skin of the other individuals pictured in the array, but there was no evidence that Boyd based his pretrial identification on Petitioner's complexion.

Even assuming, for the sake of argument, that the pretrial identification procedure was impermissibly suggestive, Jerry Boyd saw Petitioner's face from about one and a half feet away on the night of the shooting, and he subsequently wrestled with Petitioner. Although Boyd had smoked crack cocaine about five hours before the shooting, he testified that cocaine generally affected him for about fifteen minutes and that he was not feeling its effect when the shooting occurred. Boyd underestimated Petitioner's height by several inches when he described the suspect to the police, but he was certain of his identification of Petitioner at the photo line-up,

which occurred within a day of the shooting. The officer who conducted the photo array concluded from the inflection in Boyd's voice and from the speed with which he picked Petitioner's photograph that Boyd was not mistaken in his identification of Petitioner. Boyd claimed that Petitioner looked just like the suspect, and he testified at trial that he knew who shot him and that he would never forget the shooter's face.

To summarize, Jerry Boyd had an adequate opportunity to view the criminal at the time of the crime, and his degree of attention was good. His prior description of the criminal was inaccurate, but apparently only in terms of the suspect's height. Boyd was certain of his identification, and he made the identification a short time after the crime.

The Court concludes that, even if the pretrial procedure was suggestive, there was an independent basis for Jerry Boyd's in-court identification. Therefore, defense counsel's failure to challenge the photo array and Jerry Boyd's in-court identification did not amount to deficient performance. The allegedly deficient performance did not prejudice the defense because Ruby Griswold and Wanna Powell also identified Petitioner at trial as one of the shooters. The state court's conclusion -- that Petitioner failed to overcome the presumption of effective assistance of counsel -- was not contrary to, or an unreasonable application of, *Strickland*.

## IV. Conclusion

Petitioner's claims lack merit. Accordingly, the petition for a writ of habeas corpus is **DENIED**. The Court **DECLINES** to issue a certificate of appealability because reasonable jurists would not find the Court's assessment of Petitioner's claims to be debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, if Petitioner decides to appeal this decision, he may proceed *in forma pauperis* on appeal because his appeal would be taken in

good faith. 28 U.S.C. § 1915(a)(3).

                              s/Gerald E. Rosen
                              Gerald E. Rosen
                              United States District Judge

Dated: July 3, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 3, 2008, by electronic and/or ordinary mail.

                              s/LaShawn R. Saulsberry
                              Case Manager